JS 44
(Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
MIL (Investments) SARL and Jean-Raymond Boulle

## DEFENDANTS
Inco Limited, Scott M. Hand, Stuart F. Feiner, Michael D. Sopko, Harold Purdy Crawford, Charles H. Hantho, and Richard M. Thompson

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    Foreign - Luxembourg
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT    Foreign - Canada
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Anthony J. Laura
Reed Smith LLP
One Riverfront Plaza
Newark, New Jersey 07102
(973) 621-3200

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government
Plaintiff

☐ 2 U.S. Government
Defendant

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 4 Diversity
(Indicate Citizenship of Parties
in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)                           AND ONE BOX FOR DEFENDANT)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

### CONTRACT
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability

### REAL PROPERTY
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury

**PERSONAL INJURY**
☐ 362 Personal Injury — Med. Malpractice
☐ 365 Personal Injury — Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
☐ 441 Voting
☒ 442 Employment
☐ 443 Housing/ Accommodations
☐ 444 Welfare
☐ 440 Other Civil Rights

### PRISONER PETITIONS
☐ 510 Motions to Vacate Sentence
**HABEAS CORPUS:**
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

### FORFEITURE/PENALTY
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs.
☐ 660 Occupational Safety/Health
☐ 690 Other

### LABOR
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

### BANKRUPTCY
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

### SOCIAL SECURITY
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
☐ 870 Taxes (U.S. Plaintiff or Defendant
☐ 871 IRS – Third Party 26 USC 7609

### OTHER STATUTES
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 810 Selective Service
☒ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
(Cite the U.S. Civil Statute under which you are filing and write brief statement of cause.
Do not cite jurisdictional statutes unless diversity.)
Violation of the Securities Exchange Act of 1934, 15 U.S.C. Sections 78j(b), 78t(a), and Rule 10b-5

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ Not less than $63,000,000.00
CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE
DOCKET NUMBER

DATE
November 18, 2005

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

DAL:587772.1

**Anthony J. Laura, Esq.**
**REED SMITH LLP**
One Riverfront Plaza
Newark, NJ 07102
(973) 621-3200
Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MIL (INVESTMENTS) SARL and JEAN-RAYMOND BOULLE, | : |
| Plaintiffs, | : |
| vs. | : Civil Action No. |
| INCO LIMITED, SCOTT M. HAND, STUART F. FEINER, MICHAEL D. SOPKO, HAROLD PURDY CRAWFORD, CHARLES H. HANTHO, and RICHARD M. THOMSON, | : |
| | : **COMPLAINT AND JURY DEMAND** |
| Defendants. | : |

Plaintiffs MIL (Investments) SARL and Jean-Raymond Boulle (collectively, "Plaintiffs"), as for their complaint against Inco Limited, Scott M. Hand, Stuart F. Feiner, Michael D. Sopko, Harold Purdy Crawford, Charles H. Hantho, and Richard M. Thomson, allege as follows:

## PARTIES

1.      Plaintiff MIL (Investments) SARL ("MIL") is a corporation duly organized and existing under the laws of Luxembourg with its principal place of business at Boulevard Royal 25B, L-2449 Luxembourg, Grand Duchy of Luxembourg.

Page 1

2.      Plaintiff Jean-Raymond Boulle ("Boulle") is an individual residing in the Principality of Monaco with his residence at Seaside Plaza, Baliment C Mer, 6 Avenue Des Ligures, Monte Carlo 98000, Monaco.

3.      Defendant Inco Limited ("Inco") is a Canadian corporation with its principal executive offices in Toronto, Ontario, Canada, and offices in the United States.  Inco maintains sales offices in Saddle Brook, New Jersey, and has its authorized U.S. representative located at Park 80 West, Plaza Two, Saddle Brook, New Jersey 07663.

4.      On information and belief, Defendant Scott M. Hand ("Hand") is the Chairman and Chief Executive Officer of Inco.  Hand is also an Inco Director as well as a member of Inco's Management Committee.  On information and belief, Hand was the President and a Director of Inco at the time of the forced redemption at issue in this suit.

5.      On information and belief, Stuart F. Feiner ("Feiner") is Inco's Executive Vice-President, General Counsel and Secretary, and held those positions at the time of the forced redemption at issue in this lawsuit.  Feiner is also a member of Inco's Management Committee.

6.      On information and belief, Michael D. Sopko ("Sopko") was Inco's Chairman and Chief Executive Officer, as well as a Director, at the time of the forced redemption at issue in this suit.

7.      On information and belief, Harold Purdy Crawford ("Crawford") was a member of the Inco Board of Directors at the time of the redemption at issue in this suit.

8.      On information and belief, Charles H. Hantho ("Hantho") was a member of the Inco Board of Directors at the time of the redemption at issue in this suit.

9.      On information and belief, Richard M. Thomson ("Thomson") was a member of the Inco Board of Directors at the time of the redemption at issue in this suit.

10.     Defendants Hand, Feiner, Sopko, Crawford, Hantho, and Thomson are hereinafter collectively referred to as the "Individual Defendants." As the senior executives and/or directors of Inco, the Individual Defendants were responsible for and directed Inco's business operations, including the preparation and dissemination of Inco's filings with the United States Securities and Exchange Commission ("SEC") and other reports and releases which are disseminated to the investing public. The Individual Defendants had the ability to control and did control Inco's public disclosures, including those made in connection with the forced redemption at issue in this case. Consequently, Plaintiffs bring this action against each of the Individual Defendants as a "controlling person" within the meaning of Section 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78t(b). Herein, Plaintiffs assert specific allegations as against each of the Individual Defendants.

## SUMMARY OF THE ACTION

11.     This is a federal securities fraud action brought by Plaintiffs, who were beneficial owners of Class VBN Shares of Inco as of December 2000 when Inco forcibly redeemed such shares. In connection with the forced redemption, Inco employed a device, scheme or artifice to defraud by means of interstate commerce; made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices, and courses of business which operated as a fraud or deceit. More specifically, Inco, through a series of manipulative transactions and employing deceptive devices, misled and/or conspired with the Class VBN shareholders who voted in favor of a forced redemption; Plaintiffs' injuries were a direct result of that forced redemption.

12.     Plaintiffs only discovered the fraud (and its overwhelming details) beginning in February 2004, during discovery of Inco conducted in connection with an appraisal action commenced by Inco in Canada concerning the forced redemption.  Because such information resided solely in the hands of Inco and its executives/directors, including the Individual Defendants, Plaintiffs could not have discovered such information until that time.

## JURISDICTION AND VENUE

13.     Jurisdiction and venue of this Court are founded on Section 27 of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78aa (the "Exchange Act").

14.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC.  This Court, therefore, has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.  Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over those claims herein for which original federal question jurisdiction does not otherwise exist.

15.     Venue is proper in this District under 28 U.S.C. § 1391 because (i) all Defendants are aliens; (ii) Inco may be found in this District, as it does business in this District, maintains an office in this District, and has its authorized United States representative in this District; and, (iii) upon information and belief, a substantial part of the events or omissions giving rise to the claims herein occurred in this District, including the dissemination of materially false and misleading information and documents governing the forced redemption.

16.     In connection with the acts and transactions alleged herein, Inco has used, directly or indirectly, means and instrumentalities of interstate commerce, including the United States mails and the facilities of a national securities market.

**FACTUAL BACKGROUND**

**Inco, Diamond Fields Resources, Inc., and the Voisey's Bay Deposit Discovery**

17.      Inco is one of the world's largest mining and metals companies, and is the world's second largest producer of nickel.  It also produces copper, cobalt, and precious metals, and is a major producer of value-added specialty nickel products.  In 2004, Inco employed 10,973 people worldwide and had sales of $4.3 billion.

18.      In or about 1993, Diamond Fields Resources, Inc. ("Diamond Fields") discovered a nickel-copper-cobalt deposit known as Voisey's Bay Ovoid Deposit ("Voisey's Bay") in northeast Labrador, Canada (in the Province of Newfoundland & Labrador).  By all accounts, Voisey's Bay was one of the largest nickel deposit discoveries in history, and had the potential to be the richest nickel deposit in the world.

19.      In 1995, Inco purchased 25% of Diamond Fields.

**Inco Issues Class VBN Shares and Recognizes a Potential Conflict**

20.      In August 1996, Inco purchased the remaining 75% of Diamond Fields (the "Diamond Fields Transaction").  As part of the consideration for the purchase, Inco issued Class VBN Shares to the holders of outstanding Diamond Fields shares.  The Class VBN Shares were designed to provide the holders of these securities dividend payments based on 25% of the net income of the Inco subsidiary that would operate the Voisey's Bay project, Voisey's Bay Nickel Company Limited.  The projected dividends were to be issued under a policy adopted by Inco's Board of Directors.

21.      In 1996, Inco distributed a management proxy circular to shareholders in advance of an Inco special meeting to approve the Diamond Fields Transaction (the "1996 Circular").  In it, Inco acknowledged the existence of a potential conflict between the interests of Inco's

Common Shareholders and the Class VBN Shareholders. Inco's Board of Directors affirmatively stated that would commit all necessary resources at its disposal to develop Voisey's Bay in order to manage the inherent conflict of interest between the Common Shareholders and the Class VBN Shareholders. The 1996 Circular further noted a possibility that a court could restrain any act of Inco's Board of Directors that favored the interests of its Common Shareholders over its Class VBN Shareholders.

22.     Plaintiffs were holders of the Class VBN Shares from the time of the Diamond Fields Transaction until Inco's forced redemption of such shares on December 14, 2000; Plaintiff Boulle held 132,500 Class VBN Shares, and Plaintiff MIL held 675,373 Class VBN Shares.

**Franco-Nevada Elects a Director to Inco's Board, But His Concerns are Silenced**

23.     By February 1999, a company called Franco-Nevada Mining Corporation Limited ("Franco-Nevada") had acquired approximately 9,576,173 Class VBN Shares, or 37% of the Class. The Chairman of Franco-Nevada was Seymour Schulich ("Schulich").

24.     By virtue of its position as a substantial VBN shareholder, Franco-Nevada was entitled to appoint one director to Inco's Board of Directors. Franco-Nevada elected its Senior Vice President, David Harquail ("Harquail"), to fill the spot. Harquail remained on Inco's Board until the time of the forced redemption.

25.     On or about March 31, 1999, Harquail delivered a detailed letter to Inco's president at the time, Defendant Hand, regarding the strategic direction in which Inco was taking the Voisey's Bay project. In that letter, Harquail expressly questioned Inco's commitment of resources to the project development and suggested that the delay was caused by Inco's focus on strategic considerations only of benefit to Inco and its Common Shareholders, as opposed to the Class VBN Shareholders, whose interests lay in the expeditious development of Voisey's Bay.

26.     On information and belief, it was Inco's undisclosed intention to delay the development of Voisey's Bay until gaining regulatory approval to process the majority, if not all, of the nickel concentrate at its facilities in Ontario and/or Manitoba. Such a delay also had the added advantage of allowing Inco to develop the Voisey's Bay project on a timetable commensurate with its development of other mines.

**Inco Forms an Ad Hoc Committee as a Pretext to Appease the Class VBN Shareholders**

27.     On July 29, 1999, Harold Purdy Crawford, then the Chairman of Inco's Corporate Governance and Nominating Committee, proposed that Inco's Board of Directors form an "informal ad hoc committee [the "Ad Hoc Committee"] of four Directors to review, and report back to the full Board of Directors from time to time on, certain matters which might arise in the future concerning the Company's [Inco's] Class VBN Shares."

28.     The Ad Hoc Committee was thereafter formed (but did not immediately meet) and was comprised of Defendants Crawford, Hantho, and Thomson, as well as the Franco-Nevada representative, Harquail.

29.     By late Summer or early Fall of 1999, Inco's negotiations with the Province of Newfoundland & Labrador (the "Province") had reached an impasse, primarily due to Inco's insistence that it use Voisey's Bay to supply its Sudbury smelting facility.  At or around the same time, Inco halted active exploration at the mine site and closed its administrative offices in the Province.

30.     In response to these developments, on or about February 16, 2000, Harquail sent a letter to the Ad Hoc Committee seeking to activate the committee to address the Class VBN Shareholders' continuing concerns about "the direction of the VBN negotiations and management's treatment of Class VBN Shares."

31.     Harquail's letter states, in part, as follows:

For the past two years, Inco management has unsuccessfully presented development proposals to the Newfoundland government substantially different from the original intent. All the new management proposals involved the use of Inco's Sudbury facilities....

Management's move away from the smelter and refinery development scenario has been the primary cause for the failure of the Newfoundland negotiations. When management was asked at the most recent board meeting why the original development scenario was changed, the responses included:

* * * * *

5.     Spare smelter and refinery capacity at Sudbury and Manitoba. This extra capacity became available as a result of mine nationalizations started in 1998. Management's board presentations then demonstrated that from an Inco corporate perspective, a smaller Voisey's Bay project would provide a logical fit to Sudbury's and Manitoba's requirements.

The decision to change the original development scenario for the Voisey's Bay project is clearly the result of Inco's internal reappraisal of its own original assumptions regarding the project and nickel markets as well as its own changing corporate requirements.

The change in development scenarios has had a disproportionate valuation impact on the Class VBN shares.  Independent target valuations under the original scenario were as high as C$75 per VBN share (TD Securities, Inc. - Nov. 14, 1996, Appendix B.).  Target valuations based on the development scenario Inco provided analysts in late 1999 provides [sic] a target valuation of only C$12 per VBN share (TD Securities, Inc. - Oct. 8, 1999, Appendix C.).

32.     The Ad Hoc Committee immediately forwarded Harquil's letter to Inco's corporate counsel, Defendant Feiner, to draft a response.  Importantly, Defendant Feiner was neither a member of the Ad Hoc Committee nor a member of the Board.

33.     On or about May 26, 2000, Defendant Feiner issued a 16-page responsive "Confidential" memorandum which was *addressed to the Ad Hoc Committee* (including Harquail) and carbon-copied to Defendants Hand and Sopko.  In the responsive document, Defendant Feiner makes clear that Inco is primarily concerned with dismissing the VBN Shareholders' concerns and, instead, looking after the interests of its Common Shareholders.

34.     In reply, Harquail sent a letter dated May 31, 2000, to Defendant Crawford explaining his objective: "I am seeking recognition that management bears some responsibility for the changes, that these changes are having a disproportionate adverse impact on VBN shareholders, and that the directors should consider some initial recommendations as a compromise solution."

35.     Apparently, the Ad Hoc Committee was not interested in reaching a compromise solution.  In fact, the Ad Hoc Committee met on only *one* occasion -- June 2, 2000.  Defendant Crawford assumed the position of Chairman of the Ad Hoc Committee, and presided over the meeting.  According to the meeting minutes, Defendant Hand was "present by invitation," and the following discussion took place concerning the "VBN Shareholder Matter":

> **VBN SHAREHOLDER MATTER**
>
> There was a comment about whether the General Counsel of INCO was adversarial.  The Chairman indicated that such might be the case but that Mr. Harquail was also adversarial and that it was hard, on this basis, for Mr. Harquail to continue to act as a member of the Committee.
>
> Mr. Harquail outlined his concerns, earlier submitted in writing, about the way the VBN shareholders had been treated.  Mr. Scott Hand, the President of the Company, outlined the background, all of which had been presented to the Board on previous occasions.
>
> Messrs. Crawford, Hantho and Thomas met in a private session with Mr. Hand, followed by an in camera session amongst themselves at which time it was agreed that in view of Mr. Harquail's potential conflict, they should continue the meeting among the three of them in their capacity as the three outside members of the Executive Committee.
>
> Following this decision, the Committee met with Mr. Harquail and indicated it would take the matter under consideration and that a report would be made by the Executive Committee to the full Board at its meeting scheduled for July 25, 2000.  Mr. Harquail was advised that he would be notified of the nature of the report in advance of such Board meeting.

36.     Thus, in spite of the fact the Ad Hoc Committee had been expressly formed to address conflict concerns, Harquail was declared "adversarial" to the proceedings. Moreover, it appears that Defendant Crawford then adjourned the Ad Hoc Committee but immediately convened a meeting of the outside members of the Executive Committee (whose membership was the same as the Ad Hoc Committee, excepting Harquail) *with Defendant Hand*, so that it could consider the issues raised without Harquail's presence.

37.     Thereafter, Inco wholly disregarded the concerns of Harquail and the Class VBN Shareholders and continued with its corporate strategy to develop Voisey's Bay in line with its own corporate goals.

**The Franco-Nevada/Inco Negotiations and Inco's Retention of Rothschild**

38.     On or about June 8, 2000, Schulich, on behalf of the Franco-Nevada shareholders, met with Defendant Sopko to propose the terms under which Franco-Nevada would be prepared to tender its block of Class VBN Shares to Inco. In that meeting, on information and belief, Schulich told Defendant Spoko, among other things, that Franco-Nevada was prepared to have its block of Class VBN shares converted to Inco common stock, but at a premium. On information and belief, Franco-Nevada was a highly-motivated seller that desired to quickly sell its Class VBN Shares in light of a planned merger with another company. At the time, Plaintiffs were unaware of these "secret negotiations."

39.     In light of Inco's talks with Franco-Nevada, Inco's executive committee contacted N M Rothschild & Sons Canada Limited ("Rothschild") on or about June 11, 2000, and retained Rothschild on or about June 15, 2000, to provide an Inco Class VBN Share Valuation and Fairness Opinion (the "Original Rothschild Valuation") in connection with a contemplated issuer bid. According to Inco's public filings, Rothschild is a Canadian investment banking firm based

in Toronto which specializes "in providing financial advisory services to the mining industry worldwide."

40.    On information and belief, Rothschild originally proposed that its engagement be with the Special Committee (defined herein), but according to Inco's public filings, *Inco and its Board of Directors* (specifically, Defendants Sopko and Crawford) engaged Rothschild to prepare a formal valuation in connection with the herein-defined Tender Offer.   Inco paid Rothschild $800,000.00 for its "independent" work concerning the tender-offer engagement.

41.     On or about July 20, 2000, Defendant Hand drafted a "Confidential" document entitled "Class VBN Shares Possible Actions."   In this document, Defendant Hand outlined various options concerning the handling of the Class VBN Shares, and ultimately recommended to Inco's Board, presumably on behalf of the executive committee, that the company buy back all of the Class VBN Shares in the light of the negotiations with Franco-Nevada.   One of the "reasons" for this decision, as stated in the document drafted by Defendant Hand, was that: "Class VBN Shares adversely impact Inco's flexibility to pursue its strategic objectives . . . ."

**Inco Forms an Allegedly "Independent" Special Committee**

42.    Thereafter, on or about July 25, 2000, Inco's Board of Directors created a special, and allegedly "independent," committee (the "Special Committee") comprised of outside directors Defendants Hantho, Crawford, and Thomson, to, on information and belief, consider and evaluate, among other things: (i) Inco's negotiation with Franco-Nevada for the purchase of Franco-Nevada's Class VBN Shares; (ii) a valuation of the Class VBN Shares (herein defined as the Rothschild Valuation); and (iii) a contemplated issuer bid (the "Tender Offer").   According to Defendant Hand, the Special Committee's role was to take an *independent* view of the Board's

activities on behalf of *all* Inco shareholders and determine whether or not what they were doing was correct and fair.

43.    The Board's authorization of the Special Committee was contemplated well in advance of July 25th.  By July 20, 2000, Defendant Feiner had already prepared and mailed each of the Board members (*except the Franco-Nevada representatives,. Harquail and Edward Mercaldo*) a package of information concerning "Project Banjo" (a name given by Inco's management to the review and analysis of various matters relating to the Class VBN Shares).

44.    The minutes of Inco's Board of Directors meeting held on July 25, 2000, however, evidence that the only two Class VBN-affiliated directors on the Board -- Harquail and Mercaldo -- were excluded from the part of the meeting in which the Special Committee was appointed.

45.    In addition, those minutes read, in part, as follows:

> The Board of Directors then appointed Messrs. Crawford, Hantho and Thompson [sic] as an independent committee of the Board of Directors to review and evaluate the terms of the Possible Offer and oversee the negotiations with Franco-Nevada, provided that, the Possible Offer could not exceed total consideration, including the value of any fractional Common Share purchase warrant based upon the views and analysis of the Company's financial advisors, for each Class VBN Share, of Cdn. $10.00 per Class VBN Share.

46.    The Special Committee met at least nine times between August 1, 2000 and October 25, 2000 to discuss these issues.  Defendants Hand and Sopko (in addition to Inco Executive Vice-President and Chief Financial Officer George Halatsis) were present at each and every Special Committee meeting.  Defendant Feiner attended all but two of the meetings. Rothschild reported orally to the Special Committee on July 25, 2000, and August 21, 2000, and Messrs. Peter Gillin and Peter Collibee of Rothschild attended the September 6, 2000 meeting. Gillin had provided advisory services to Inco in the past.

47.     In contrast, at each of the regular and special meetings of Inco's Board of Directors convened after July 25, 2000, at which the issuer bid (and, subsequently, the redemption) of the Class VBN Shares was on the agenda, both Harquail and Mercaldo were excluded on the grounds of their conflicts of interest as designates of the Class VBN Shareholders, and, in fact, not even advised of the existence of some of the meetings.

48.     While still a member of Inco's Board, Defendant Crawford resumed his practice at Osler, Hoskin & Harcourt LLP (Inco's outside counsel) as Counsel in March 2000.  During at least part of his tenure on the Inco Board, and at all material times while serving as the chairman of the Ad Hoc and Special Committees, Defendant Crawford was a member of, or retained by, Oslers and maintained an office and mailing address at its Toronto headquarters. As such, the chairman of the Special Committee was tainted by his long association with Inco's legal counsel and Oslers' ongoing retainer with Inco.

49.     The Special Committee never retained independent counsel to assist it, nor did it retain any independent share valuation advice.  Instead, the Special Committee minutes reflect that the committee merely "rubber-stamped" the recommendations of Inco's executive committee.

**Inco Gains Control of Franco-Nevada's VBN Shares Through a Lock-Up Agreement**

50.     On or about September 5, 2000, Inco and Franco-Nevada entered into a Private and Confidential "Lock-Up Agreement" under which Inco "locked up" Franco-Nevada's 37% block of shares.  The Class VBN Shareholders whose shares were not controlled by either Inco or Franco-Nevada did not participate in any "Lock Up Agreement" negotiations, and were not represented at any of Inco's meetings with Franco-Nevada.

51.     As a term of the "Lock-Up Agreement," Mercaldo, who had objected to the idea of the Tender Offer on several occasions due to the low value assigned to the Class VBN Shares, resigned his position as a VBN-designated director on Inco's board.   In exchange for his resignation, Inco provided Mercaldo with an indemnity in respect of events that took place while he was a member of Inco's Board of Directors, and specifically with respect to the Board's and his analyses concerning the Class VBN Share issues.

**Inco's Tender Offer For the Outstanding VBN Shares Fails**

52.     Having firmly "locked up" Franco-Nevada's VBN Shares, Inco announced its intention to make an offer to purchase all of its outstanding Class VBN Shares for CDN $7.50 in cash (or the equivalent in U.S. dollars) and 0.45 of an Inco common share purchase warrant for each Class VBN Share (the "Tender Offer").   The Offer to Purchase was issued on September 15, 2000, and included the Original Rothschild Valuation which served as the foundation for the Board's decision to move forward with the offer.   Inco conditioned the Tender Offer on at least 90% of the Class VBN Shares being tendered and not withdrawn.

53.     On information and belief, Inco rushed to make the Tender Offer before the "value" of Inco's Class VBN stock increased.   On August 27, 2000, Defendant Hand sent an e-mail to Defendant Sopko, copying Defendant Feiner and others, stating: "The more the possibility of doing a deal is delayed we need to be thinking about alternatives.   We have said all along to FN [Franco-Nevada] that the more time the buyback is delayed the greater the possibility that the Province of Newfoundland and Labrador will start discussions and when this happens, we will find it very difficult to do the buyback."

54.     On or about October 16, 2000, Inco disseminated to Class VBN shareholders a Notice of Variation and Change which extended the expiration of the Tender Offer to October

27, 2000, and included additional disclosures. That month, certain individuals had filed a class action against Inco and certain of Inco's executive officers in connection with the Tender Offer in the case styled *LLOV Partners, Individually and on Behalf of All Others Similarly Situated v. INCO Ltd., et al.*, Civil Action No. 00-4999 (NHP) in the United States District Court for the District of New Jersey. The parties settled in September 2001, and a non-opt-out class of plaintiffs was certified for settlement purposes. Specifically excluded from the case and the class were, among others, "Class VBN shareholders who duly perfected their appraisal rights under Section 190 of the Canadian Business Corporations Act (the 'CBCA')." For this reason, Plaintiffs here were not subject to the settlement.

55.     On or about October 26, 2000, Inco announced that if the 90% tender requirement was not satisfied, it would allow the Tender Offer to expire on October 27, 2000, in accordance with its terms, and instead would hold a special shareholders' meeting (the "Special Meeting") to seek shareholder approval of a plan to redeem the Class VBN Shares (the "Redemption") for a price of CDN $7.50 (or the equivalent in U.S. dollars) and 0.45 of an Inco warrant ("Warrant"), where one Warrant would entitle the holder to purchase one common share of Inco for CDN $30.00 (the "Special Resolution").

56.     The Tender Offer expired in accordance with its terms on October 27, 2000, without the condition that at least 90% of the Class VBN shares (on a fully diluted basis) tender having been satisfied.

**Its Tender Offer Unsuccessful, Inco Turns to a Forced Redemption**

57.     On that same date, Inco, by and through Defendant Sopko, issued a Management Proxy and Circular (the "Proxy Circular") which gave notice of the Special Meeting, to take place on November 28, 2000. Included in the Proxy Circular was a Rothschild Valuation dated

October 26, 2000 (the "October Rothschild Valuation") which updated VBN Share valuation information in the context of the Redemption but included much of the same information as was presented in the Original Rothschild Valuation. The Proxy Circular also included Inco's admission that the interests of the VBN shareholders and those of the common shareholders could conflict for various reasons described therein.

58.     On information and belief, in addition to the fees already paid to Rothschild for the Original Rothschild Valuation, Inco paid Rothschild an additional $300,000.00 for the October Rothschild Valuation.

59.     On November 24, 2000, Plaintiffs gave notice to Inco that they objected to the Special Resolution. Plaintiffs also voted against the Special Resolution via proxy.

60.     Inco held the Special Meeting on or about November 28, 2000, and thereafter announced that the amendments to terms of the Class VBN shares had been approved and, as a result, the Redemption could proceed.

**Inco Misleads and/or Conspires With Class VBN Shareholders**

61.     On or about December 1, 2000, Inco issued, by and through Defendant Feiner, a Notice of Redemption, and on or about December 6, 2000, Inco sent to each of the dissenting shareholders (including Plaintiffs) a Notice of Special Resolution advising that the Redemption resolution had been adopted at the Special Meeting.

62.     Plaintiffs, as dissenting shareholders, sent to Inco a notice, including a demand for fair payment of the fair value of their Class VBN Shares, as provided in the Canadian Business Corporation Act ("CBCA"), and forwarded the corresponding share certificates, duly perfecting their rights.

63.     The effective date of the forced Redemption was December 14, 2000.  At the time of the Redemption, Inco had not even conducted a feasibility study on the Voisey's Bay project.

64.     On information and belief, Inco's Board of Directors determined to forcibly redeem the Class VBN Shares with the intention of preferring the interests of Inco's Common Shareholders to the detriment of the Class VBN Shareholders.  More specifically, Inco, through a series of manipulative transactions and employing deceptive devices, misled and/or conspired with the Class VBN shareholders who voted in favor of a forced redemption; Plaintiffs' injuries were a direct result of that forced redemption.

65.     As of December 14, 2000, the date of the Redemption, the shareholders' (including Plaintiffs') equity in the Class VBN Shares was at least $753 million.  Nevertheless, Inco was able to redeem the shares for a total redemption price of $133 million plus approximately 11.6 million Warrants -- a discount of over $600 million.  Moreover, Inco allocated the amount to the "contributed surplus" on Inco's balance sheet, treating the transaction as a "contribution" to its Common Shareholders.

**After Inco Commences a Canadian Appraisal Action, Plaintiffs First Discover Inco's Scheme in Connection with the Redemption**

66.     On or about January 16, 2001, Inco commenced an appraisal action in the Ontario Superior Court of Justice – Commercial List pursuant to the CBCA, requesting that the Court fix the fair value of the Class VBN Shares of the dissenting shareholders (the "Canadian Action").

67.     All non-public records relating to the Redemption are under the exclusive custody and control of Inco.  It was only in connection with one phase of discovery that began in February 2004 during the Canadian Action that Plaintiffs first learned from Defendant Hand material facts indicating that Inco, as influenced by or at the direction of its senior management (including the Individual Defendants), its Board of Directors, and/or allegedly independent

committees, schemed to redeem the Class VBN Shares at a price more advantageous to it and its Common Shareholders, to the detriment of the Class VBN Shareholders.

68.     This discovery in the Canadian Action revealed that Inco sought to redeem the Class VBN Shares when the impediments to the commercial development of the Voisey's Bay project were being resolved.  To the extent that such impediments existed at the time of the Redemption, they were the product, in whole or in part, of a corporate strategy at Inco to delay the development of the Voisey's Bay project for the purposes of forcing the redemption of the Class VBN shares (including those held by Plaintiffs) at a price more advantageous to Inco and its Common Shareholders.

69.     At the time of both the Tender Offer and the Redemption, Inco touted Rothschild to the public and its shareholders, including the VBN Shareholders, as "an independent expert." But, in drafting both the Original Rothschild Valuation as well as the October Rothschild Valuation, Rothschild did not undertake any independent analysis of the underlying information provided to it by Inco nor did it engage any independent mining, metallurgical, construction or political consultants to assess the reasonableness, accuracy or completeness of the information provided to it by Inco's management.

70.     On information and belief, at the direction of Defendants Hand and Feiner, Inco failed to disclose the following material facts to (i) Rothschild in connection with its valuation of the Class VBN Shares, and (ii) all Class VBN Shareholders (including Plaintiffs) in connection with the Redemption:

•     Inco's intent to delay the development of the Voisey's Bay project until gaining regulatory approval to process the majority, if not all, of the nickel concentrate in its own facilities in Ontario and/or Manitoba;

at had been inserted by Rothschild regarding

l concentrate from the Voisey's Bay project;

o specific types of "fiscal assistance" (in the

d to obtain from the federal government and

ct.

cutives at Inco, including Defendant Hand,

l commented on it before it was finalized.  In

wrote to Defendant Hand: "I look forward to

comment prior to a decision being taken."

ate to come and talk about it and where

orward."  On information and belief, excerpts

l to Inco's Jim Scott on or about August 23,

einer reviewed a draft of the valuation when

discussed by the committee on September 6,

n-feeding Rothschild controlled information.

l asked Defendant Feiner whether or not he

o Rothschild, and by e-mail exchange of the

dant Hand and Halatsis, discussed the same

des of additional "Expected Resources."  On

that Inco provide it with a memorandum

y's Bay Nickel project may be more than the

- The details of renewed negotia

and after the resignation of Premier Tobin in O

- The extent to which Inco w

concentrate shipped out of the Province of Nev

- That Inco had promising mate

Bay mine.

71.    Moreover, on information and

Defendant Feiner, Inco failed to disclose the fo

Shareholders (including Plaintiffs) in connectio

- Inco had directed Rothschild, i

narrow range of values within which the redem

- Inco itself drafted or rewrote s

Inco's purposes.

Specifically, by correspondence dated

Gillin and Collibee at Rothschild "some final

Rothschild Valuation, including the following r

(i)    changing the addressee

(which was originally created for the purpos

"independent work") to Inco's Board of Directo

(ii)    deleting Rothchild's ref

shares";

currently estimated 150 Mt." On August 16, 2000, Halatsis sent Defendant Hand the following e-mail message regarding Inco's mathematical version of the Voisey's Bay project "upside": "Scott, Here's what Jim expects to review with Rothschild. It adds up to at least $15/VBN share. I tod [sic] Jim, we have to get Rothschild up to $12+. I have a call in to Peter Gillin." Inco's "upside" model was then passed on to Rothschild. In addition, Rothschild representatives met with Inco's senior management, including Defendants Sopko, Hand and Feiner, to conduct a "due diligence" session "prior to the delivery of Rothschild's formal valuation of the Inco VBN Shares to the Special Committee and Board of Directors of Inco."

74.     Each of these omissions also affected Rothschild's valuation of the VBN shares in October 2000 in connection with the Redemption.

75.     On information and belief, each of these omissions, only just discovered by Plaintiffs beginning in February 2004 during the deposition of Hand, was intended to cause, and did cause, a substantial decrease in the valuation of Plaintiffs' Class VBN Shares at the time of the Redemption.

76.     At all times material hereto, Defendant Hand was the President and a Director of Inco. On information and belief, Defendant Hand regularly interacted with Rothschild and the Special Committee.

77.     At all times material hereto, Defendant Feiner was Inco's Executive Vice-President, General Counsel and Secretary. Upon information and belief, Defendant Feiner regularly interacted with Rothschild and the Special Committee.

78.     At all times material hereto, Defendant Sopko was the Chairman and CEO of Inco. On information and belief, Defendant Sopko interacted regularly with Rothschild and was

ultimately responsible for the information Inco provided (or failed to provide) to both Rothschild and Inco's shareholders.

79.     At all times material hereto, Defendant Crawford was a member of Inco's Board of Directors, and chaired not only the Ad Hoc Committee but also the Special Committee. Defendant Crawford was also affiliated with Inco's outside counsel, Oslers, from March 2000 on.

80.     At all times material hereto, Defendant Hantho was a member of Inco's Board of Directors, and sat on the Ad Hoc Committee and the Special Committee.

81.     At all times material hereto, Defendant Thomson was a member of Inco's Board of Directors, and sat on the Ad Hoc Committee and the Special Committee.

82.     As noted above, on January 16, 2001, Inco commenced the Canadian Action.  On February 1, 2000, Inco joined the Plaintiffs herein as Defendants in that Action.   Consequently, Plaintiffs' means of discovering Inco internal information relevant to their claims was in the Canadian Action, and Plaintiffs' efforts to obtain discovery outside of the Canadian Action were thwarted by Inco.  Inco even resisted Plaintiffs' efforts to obtain discovery in the Canadian Action, and it was not until Inco finally produced its corporate representative, Defendant Hand, for deposition in the Canadian Action starting in February 2004 that Plaintiffs were able to begin to discover the material facts underlying the allegations of wrongdoing set forth herein.

### FIRST COUNT

### (Violation of Section 10(b) of the Exchange Act)

83.     Plaintiffs hereby incorporate each allegation in paragraphs 1 through 82 as if fully set forth.

84.     The class VBN Shares were securities within the meaning and intent of the Exchange Act and the rules and regulations adopted pursuant thereto.

Page 22

85.     In committing or causing the acts and transactions herein alleged, Inco, in connection with the purchase and sale of securities by means of interstate commerce, to-wit, the Redemption of the Class VBN Shares, by conduct of the Individual Defendants, employed a device, scheme or artifice to defraud; made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated as a fraud or deceit.  As set forth herein, Inco, through a series of manipulative transactions and employing deceptive devices, misled and/or conspired with the Class VBN shareholders who voted in favor of the Redemption.

86.     Defendants acted intentionally in misleading and/or conspiring with the Class VBN Shareholders who voted in favor of the Redemption, and Defendants intended for Plaintiffs to suffer the damages that they have.  Defendants knew that the Class VBN Shares were worth significantly more than the Redemption price, and intentionally failed to disclose material facts to the Class VBN Shareholders in connection with the Redemption.   Defendants were motivated to withhold this information from Plaintiffs in order to induce the VBN Shareholders to approve the Redemption.   Alternatively, Defendants acted in reckless disregard of the Class VBN Shareholders' (including Plaintiffs') known rights.  In furtherance of its fraud, Inco, which had exclusive custody and control over all relevant records and information regarding the Redemption, effectively delayed and obstructed Plaintiffs' attempts and rights to obtain information regarding the Voisey's Bay project and the Class VBN Shares.

87.     Plaintiffs did not, and could not in the exercise of due care, discover the material facts that Inco failed to disclose, as described above, until February 2004, at the earliest.

Accordingly, the period of limitation under the Exchange Act did not commence until February 2004, at the earliest.

88.     As a result of Defendants' wrongful conduct as aforesaid, Plaintiffs have suffered substantial damages.

89.     The wrongs done by Defendants were wanton, wilful and in reckless disregard of Plaintiffs' rights, and were aggravated by the kind of fraud for which the law allows the imposition of punitive damages.

## SECOND COUNT

### (Conversion and Misappropriation)

90.     Plaintiffs hereby incorporate each allegation contained in paragraphs 1 through 89 as if fully set forth.

91.     By virtue of the forced Redemption, to which Plaintiffs' duly objected, Inco has wrongfully converted and misappropriated Plaintiffs' Class VBN Shares unlawfully, over Plaintiffs' objection and without just compensation.

92.     As a result, Plaintiffs have suffered substantial damages.

93.     The wrongful conversion and misappropriation of Plaintiffs' Class VBN Shares was wanton, wilful and in reckless disregard of Plaintiffs' rights, and were aggravated by the kind of fraud for which the law allows the imposition of punitive damages.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs demand judgment in the following form:

(i)     Judgment against Inco, Hand, Feiner, Sopko, Crawford, Hantho and Thomson awarding Plaintiffs damages, both general and special, as allowed by law and by equity and interest at the rate allowable by law;

Page 24

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 201.1(d)(3)

The undersigned counsel of record for the Plaintiffs certifies that the damages recoverable by Plaintiffs on their Complaint exceed the sum of $150,000.00, exclusive of interest and costs and any claim for punitive damages.

I certify under penalty of perjury that the foregoing is true and correct.  Executed this 21st day of November, 2005.

_____
ANTHONY J. LAURA

(ii)    Judgment awarding Plaintiffs' punitive damages in an amount to be determined at trial plus interest at the rate allowable by law;

(iii)    Judgment imposing a constructive trust in Plaintiffs' favor upon the Class VBN Shares of Plaintiff redeemed by Inco by virtue of the Redemption; and

(iv)    Judgment awarding Plaintiffs' costs and disbursements of this action, including reasonable attorneys' fees.

### JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: November 21, 2005

**REED SMITH LLP**

By: _____

Anthony J. Laura
One Riverfront Plaza
Newark, New Jersey 07102
Telephone: (973) 621-3200

Dennis N. Ryan, Texas State Bar No. 17470700
Robert Weathersby, Texas State Bar No. 21004050
Suzanne Campbell, Texas State Bar No. 24027547
**ANDREWS KURTH LLP**
1717 Main, Suite 3700
Dallas, Texas 75201
Telephone: (214) 659-4400

Stephen F. Malouf, Texas State Bar No. 12888100
**The Law Offices of Stephen Malouf, P.C.**
3506 Cedar Springs Road
Dallas, Texas 75219
Telephone: (214) 969-7373

**Attorneys for Plaintiffs**
**MIL (Investments) SARL and**
**Jean-Raymond Boulle**